# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **TARA METHENEY,** | ) | **CASE NO. 1:16 CV 2398** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **Defendants.** | ) | **AND ORDER** |

This matter is before the Court on the Motion to Dismiss filed by Defendant, United States of America. (Docket #41.) Pursuant to Fed. R. Civ. P. 12(B)(1), Defendant USA asks this Court to dismiss any request for relief made by Ms. Metheney beyond fifteen thousand dollars ($15,000.00) for lack of subject matter jurisdiction, arguing she has failed to prove intervening facts or newly discovered evidence which would justify obtaining more relief than stated in her Administrative Claim.

**I.     Factual and Procedural Background.**

On April 23, 2012, Ms. Metheney obtained a total left ankle replacement from Dr. Howard Kimmel at the Veterans Affairs Medical Center in Cleveland, Ohio ("VAMC") due to preexisting osteoarthritis. (Complaint at ¶ 7.) Ms. Metheney had follow-up appointments with Dr. Kimmel on May 24, 2012, June 21, 2012, July 5, 2012, November 29, 2012, August 14, 2013 and November 26, 2013, during which she complained of pain, numbness, and problems

with the incision, all of which were indicated complications she acknowledged prior to surgery. Prior to surgery, Ms. Metheney had also been warned of the risk that she may require a future ankle replacement or ankle fusion surgery. (Docket #39-2, Joint Exhibit B, at pp. 1-8.) Amputation was not a stated risk.

Due to continued pain, Ms. Metheney sought care outside of the VAMC. On January 16, 2015, Ms. Metheney began treating with Dr. David Welker in Washington, Pennsylvania. (Docket #40, Joint Exhibit C.) An x-ray revealed a loose and possibly infected implant. Dr. Welker offered Ms. Metheney three options: ankle replacement revision, ankle fusion, or an amputation. (Id. at p. 4.) Ms. Metheney met with Dr. Welker again on February 9, 2015 and Dr. Welker noted that the plan was "to take the total ankle out and at least do a hind foot fusion nail and a cadaveric implant" and that he "discussed the risks and benefits of that which clearly included in that risk is an amputation. She understands that. She wishes to go ahead and proceed." (Id. at p. 14.) He also explained risks of "failure to improve," "the need for additional surgery," and other potential complications.

Dr. Welker performed the ankle fusion surgery on March 2, 2015. Ms. Metheney signed a consent form and reviewed the risks and benefits of the procedure. Between March 12, 2015 and July 8, 2015, Ms. Metheney had five follow-up visits with Dr. Welker, with Dr. Welker noting during the July 8, 2015 examination that Ms. Metheney had "very little swelling" and was "doing great." Dr. Welker stated, "She has no complaints of any numbness, tingling or burning; no complaints of any pain. She is fully weight-bearing on this." (Docket #40, Joint Exhibit C at 81.)

On July 20, 2015, 12 days after her July 8, 2015 appointment with Dr. Welker, Ms. Metheney filed her initial Administrative Claim for Damage, Injury or Death, Standard Form 95

("Administrative Claim"), with the Department of Veterans Affairs, seeking $3,300.00, which she indicated was the amount of her deductible. On her claim form, Ms. Metheney explained as follows:

> On 4/23/12 Dr. Kimmell at Wade Park VA facility (podiatry) inserted an artificial ankle (STAR) to replace my arthritic ankle. When I first saw my Xray, I stated to Dr. Kimmell that it is crooked. He said no it isn't, but I disagreed. He assured me it was fine. I continued to question the placement of the replacement. Over the next three years, I grew progressively worse. I became unable to walk without assistance or a device. I continued to ask the VA Drs. to please look at my new ankle. Without Xray or further exam, they at Wade Park continued to make braces, devices support wraps, special shoes, etc. I continued to tell them it is crooked. I showed them how the devices were wearing to the outside as my foot was being thrown to the outside. After about a year and half, I changed Drs, still within the VA. Again, the 2nd VA Dr. said we will make a wedge, to force my ankle back in line. I became worried and sought outside assistance.
>
> At this point my ankle was completely swollen, and too painful to walk, I was extremely fatigued and my system was suffering having fought the damage in my ankle for so long. I had to stop all every day activities, and my quality of life changed drastically.
>
> On Feb. 2015, I went to Washington PA to Washington Advanced Orthopedics. Dr. Welker advised the device must be removed as it was tearing up the ankle and he was concerned about infection in the bone. The device had torn up the tissue around my ankle and the tibea bone was damaged.
>
> Dr. Welker was concerned that I may, at this point, lose my foot above the ankle. I under went extensive testing trying to make sure there was no infections.
>
> I was constantly traveling 2 ½ hours to have my ankle tended to.
>
> On March 2, 2015, Dr. Welker removed the device, and I underwent major surgery to correct the damage from the (STAR) original device.
>
> Once again, I am in a wheelchair and on crutches for 3 months.
>
> Dr. Welker cut the inside bone off (of the tibia) as it was damaged. He inserted a cadaver bone into the joint about 2" high. He cut the fibula and pinned it against the cadaver bone in hopes to help it adhere and feed the blood supply. He also drove a rod thru my heel and into the tibea about half way up. Secured all areas with 6 screws. We still have to wait to see if my ankle will accept the cadaver bone. If it does not, I will still lose my foot above the ankle.
>
> From the first day of corrective surgery, 3/2/15, my ankle feels better,

-3-

> even tho [sic] I have a ways to go, and my system is recovering.
>
> That being said, if only the VA Drs. would have helped me or admitted the device was crooked, I wouldn't be going thru this and the worry of losing my foot, not to mention the loss of quality of life.
>
> I am attaching files, Xrays, and information I have to show progression over the past 3 years.
>
> I wish my co-payments reimbursed. I am unsure of the amounts exactly. The bills are still coming in. I will submit what I have thus far.
>
> I can also make available as many witnesses as you desire.
>
> Please consider refund for my co-pay thru Champ VA. I am currently making payments and trying to keep them up to date.
>
> I am still waiting on the last of the bills but this is the approximate balance thus far.
>
> Please see my VA files in this matter. Also see attached information.
>
> \* \* \*
>
> Total co-pay so far is 3300:
> some billing has not yet been sent to me.
> I am making payments and on some accounts I have paid in full.

(Docket #39-2, Joint Exhibit B, at p. 1.)

On September 10, 2015 and November 19, 2015, Ms. Metheney obtained additional treatment from Dr. Welker. At her November 19, 2015 follow-up, Dr. Welker noted that it appeared there was "good consolidation of the [cadaver bone]" after review of the most recent x-ray studies. (Docket #40, Joint Exhibit C, at p. 87.) He attributed her pain at the time in the plantar aspect of her foot to the rod he had implanted. On January 6, 2016, Dr. Welker noted some tenderness and pain on the bottom of her foot, but that Ms. Metheney denied pain elsewhere and was "back walking and doing most of her normal activities." However, an x-ray,

CT Scan, and physical exam revealed the ankle fusion failed. Ms. Metheney agreed to have the rod and a broken screw removed. Ms. Metheney signed a consent acknowledging, "the risks and benefits were discussed and include but were not limited to infection, bleeding, damage to nerve, artery, vein or muscle, need for further surgery, failure to improve, stiffness, hardware failure, hardware prominence, continued pain, post-traumatic osteoarthritis." There was no mention of the risk of amputation.

On January 8, 2016, Ms. Metheney wrote a letter to the US Department of Veterans Affairs ("VA"), stating as follows:

> Dear Mr. Hales,
>
> I spoke with my Dr. and I wish to increase my claim to $15,000.00. That will include past, present and any unforseen costs that may arise. CT Scan is still pending at this time so final decision has not been made. I am in constant pain so I am not sure where this is going.
>
> In reference to your question about being on a roof, yes I remember having a problem but it was with the other leg; and the roof has almost no pitch. (I got a shot). But also, Dr. Kimmell had instructed that I was free to do anything within tolerance. No restrictions whatsoever.

On January 15, 2016, the VA denied Ms. Metheney's Administrative Claim, stating that an internal review indicated that she received proper medical care at the VAMC that met the applicable standard of care. (Docket #39-2, Joint Exhibit B, at p. 9.)

Ms. Metheney had surgery on January 18, 2016. A "preoperative CT scan revealed an incomplete union of her ankle fusion" and the purpose of the surgery was to "dynamise the nail" to get a "better bony compression." Dr. Welker noted that he removed a nail and that Ms. Metheney understood the surgery would not resolve plantar pain. On February 1, 2016, Dr. Welker noted that Ms. Metheney is "doing fine," had "no complaints," and "her ankle pain is

-5-

much better since we took the screw out."

On March 3, 2016, Ms. Metheney submitted a request for reconsideration of the denial of her Administrative Claim, and sought to increase her claim to $150,000.00, stating as follows:

> Dear Mr. Shively,
>
> This is a Request for Reconsideration in the matter of Tara M. Metheney. Reference # listed above.
>
> I had originally requested compensation for the co-pay that I had paid due to my ongoing injury. Then I realized I would need yet more surgeries, which that amount would not cover so I increased that amount.
>
> Mr. Hales has since then denied said claim on the basis that devices fail. I do not argue that point except that I begged for three years to have the VA check what I could feel was physically wrong with the original replacement and they continued to deny that there was a problem. I am not a doctor so I endured as long as possible. After I attended a second VA orthopedist, the only thing that was mentioned was yet another insert for my shoe. All of this is in the file with Mr. Hales.
>
> Since my last request for increase I have learned that it was noted in my VA file, in 2012, that the device could be loose. I was never informed of this and it was never addressed. I have also learned that I have yet more surgeries to endure and I am by no means cleared for the possibility of amputation of my foot up to about the shin area. My physical and mental state has been stressed to the maximum and I am to the point that I have told my husband I can no longer endure the pain and suffering. He has been a God-send.
>
> With that being said, I ask for reconsideration in the amount of $150,000 since we have to be in a timely manner and the future is very unclear. I would also request that we come up with a solution for compensation at a later date if I should need said amputation. My Stress and worry about amputation is taking a toll on me, not to mention my marriage, pain and the bills that are piling up.
> Should you need anything else please do not hesitate to contact me.
> Thank you in advance for your consideration.

(Docket #39-2, Joint Exhibit B, at pp. 14-16.)

On March 7, 2016, at the two-month follow-up for the rod removal procedure, Dr. Welker referenced the healing of the cadaver bone allograft and noted that the x-rays showed

"further incorporation" of the graft. (Docket #40, Joint Exhibit C, at p. 110.) In spite of complaints of a fair amount of pain, Dr. Welker informed Ms. Metheney to increase activities as tolerated and return for x-rays in a couple of months. (Id.)

On March 18, 2016, Ms. Metheney submitted a letter to the VA and asked to rescind her request for reconsideration. (Docket #39-2, Joint Exhibit B, at p. 17.) On March 30, 2016, the VA denied Ms. Metheney's requests for reconsideration and rescission. (Id. at p. 20.)

On June 1, 2016, Dr. Welker removed a rod, an additional broken screw, and the remaining hardware, noting that Ms. Metheney retained a screw and metallic fragments in her bone from the ankle fusion. (Docket #40, Joint Exhibit C, at pp. 121 and 130-31.) Ms. Metheney saw Dr. Welker on August 17, 2016 and complained of swelling and pain. She signed a consent form and accepted Dr. Welker's recommendation of a fusion and a bone graft to replace the complete loss of a portion of her ankle bone. (Id. at pp. 145, 153.) However, Dr. Welker was unable to do so during surgery on August 29, 2016 because of a bone infection. (Id. at pp. 160-61 and 165.)

Ms. Metheney had surgery on September 6, 2016 and Dr. Welker indicated he was attempting to remedy Ms. Metheney's "failed ankle fusion." (Id. at pp. 178-79.) Dr. Welker removed a bone from Ms. Metheney's hip and fused it to the failed portion of her ankle. (Id.)

Ms. Metheney followed up with Dr. Welker on September 16, 2016, September 26, 2016, and October 20, 2016. Dr. Welker indicated that Ms. Metheney had no signs of infection and was doing well on those dates. (Id. at pp. 188, 191 and 194.) However, on December 7, 2016, Dr. Welker noted Ms. Metheney needed a wheelchair and was unable to ambulate on her own. (Id. at p. 200.) On December 21, 2016, Dr. Welker indicated that Ms. Metheney's ankle did not fuse, "her CT scan showed still residual non-union." (Id. at p. 204.) On January 18, 2017, Dr. Welker

concluded the second ankle fusion was unsuccessful and Ms. Metheney was "ultimately . . . going to need to have an amputation of some variety." (Id. at p. 210.)

Dr. Welker referred Ms. Metheney to Dr. James Sferra for a second opinion. (Id. at p. 210.) On January 23, 2017, Dr. Sferra examined Ms. Metheney and noted as follows:

> We discussed at length her options that she could consider another attempt with graft, this would likely take 1 year for her to recover and given that it would be a 3rd revision the likelihood that it would work is reduced significantly. We discussed a below the knee amputation the risks benefits and alternatives as well as recovery. She would like to proceed with this intervention at this time to be performed by Dr. Welker.

(Id. at p. 217.)

On February 15, 2017, a third physician, Dr. Stephen Conti, examined Ms. Metheney and noted as follows:

> [He] suggested to the patient that the best treatment for a functional outcome would be a below-knee amputation. He discussed the possibility of a salvage procedure but also explained clearly that the success rate of such a procedure would be very low considering her condition. The patient was happy with the treatment option of a below-knee amputation on the left and would schedule her surgery for Dr. Welker. She left the office pleased.

(Id. at p. 232).

Ms. Metheney met with Dr. Welker on February 23, 2017, signed a consent form acknowledging the risks and benefits of a below-knee amputation and, on February 27, 2017, underwent a below-knee amputation. (Id. at pp. 236, 241-243 and 245-49).

**II.     Complaint / Motion to Dismiss.**

On September 29, 2016, Ms. Metheney filed her lawsuit in this Court, alleging medical malpractice and lack of informed consent against the United States relative to her 2012 ankle replacement performed by Dr. Kimmell at the VAMC. Ms Metheney seeks damages in the amount of $1,000,000.00.

Defendant USA filed its Motion to Dismiss on June 30, 2017. (Docket #41.) In its Motion to Dismiss, Defendant USA asserts that the Court lacks subject matter jurisdiction for any amount claimed over $15,000.00 – the amount of Ms. Metheney's original Administrative Claim – pursuant to 28 U.S.C. § 2675(b). On August 1, 2017, Ms. Metheney filed her Memorandum in Opposition. (Docket #42.) Ms. Metheney argues that newly discovered evidence – the change in expectation as to the severity and permanence of her injury – allows her to seek an amount in excess of her original claim. Defendant USA filed a Reply Brief on August 11, 2017. (Docket #43.)

### III. Standard of Review.

"Where subject matter jurisdiction is challenged pursuant to 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Michigan Southern R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n, Inc.*, 287 F.3d 568, 573 (6th Cir. Mich. 2002). Rule 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties – facial and factual challenges. Defendant USA raises a factual challenge to jurisdiction. A factual challenge "'is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction. On such a motion, no presumptive truthfulness applies to the factual allegations and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. Tenn. 1994) (citations omitted).

### IV. Discussion.

28 U.S.C. § 2675(b) provides as follows:

Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, **except where the increased**

> **amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.**

The burden is on the claimant to show such intervening facts or newly discovered evidence. *Allgeier v. United States,* 909 F.2d 869, 877 (6th Cir. Ky. 1990) (citing *Kielwien v. United States*, 540 F.2d 676, 680 (4th Cir. Cal. 1976)). Unforeseen complications or additional surgeries may constitute an intervening fact where a plaintiff's condition improves and she is led to believe that the injuries are "to some extent cured." *Allgeier*, 909 F.2d 869, 879. In *Allgeier*, the Court stated as follows:

> In sum . . . it seems that because of the relative improvement in Boldrick's condition immediately before the administrative claim was filed and the significant worsening of her condition well over a year later, the need for the second operation and extensive additional treatment were not reasonably foreseeable at the time the administrative claim was filed. Our decision in this regard is also fortified, although not controlled, by the absence of any evidence of bad faith or manipulation intended to by-pass the notice requirements of the statute."

*Id.*

The Court has carefully reviewed the record in this case and, while Defendant USA argues that Ms. Metheney's reference to amputation in her Administrative Claim precludes her from recovery above $15,000.00, the Court does not agree. Ms. Metheney alleges medical malpractice and lack of informed consent against the United States relative to her 2012 ankle replacement performed by Dr. Kimmell at the Cleveland VAMC. Amputation was not a risk discussed with Ms. Metheney prior to her 2012 surgery, but was first mentioned as an option for treatment – and as a potential risk of the fusion surgery she ultimately chose – when she sought treatment from Dr. Welker to fix what she alleges was a botched surgery performed by Dr. Kimmell.

While she references the worry of possible amputation in her July 20, 2015 Administrative Claim, she filed her claim when it appeared that her March 2, 2015 surgery was successful, her leg had not been amputated, and she limited her claim to the amount of her co-pays/deductible. During the nearly six months her Administrative Claim remained pending without decision, Ms. Metheney's condition worsened, prompting her to increase her claim to $15,000.00 on January 8, 2016, based on additional costs she anticipated, and again ask for an additional increase to $150,000.00 (after her Administrative Claim had already been denied) when she feared additional costs and the possibility of additional treatment, including amputation. Like *Allgeier*, the significant worsening of her condition months after she filed her Administrative Claim and the need for additional surgeries and extensive treatment, including amputation, were not reasonably foreseeable at the time the Administrative Claim was filed.

Further, while not dispositive, there is no evidence "of bad faith or manipulation intended to by-pass the notice requirements of the statute." *Allgeier*, 909 F.2d 869, 879. The Court is mindful of the fact that Ms. Metheney filed her Administrative Claim *pro se*, limiting the amount claimed to her copays/deductibles and anticipated expenses; offering to provide documentation to support her request; and, attempting to withdraw her request for reconsideration and an increase at a time when the medical records indicate her condition had improved temporarily. One can certainly understand the fear that would persist in Ms. Metheney's mind that she may lose her leg, even after her condition seemed to be resolved. However, the complications and eventual amputation suffered by Ms Metheney months after filing her Administrative Claim were not reasonably foreseeable at the time her Administrative Claim was filed, given what seemed to be a significant resolution of her condition. Ms. Metheney would have had to baselessly inflate the amount requested in her Administrative Claim to include expenses for an

-11-

amputation which, at the time of filing her Administrative Claim, hadn't happened and was not indicated by Dr. Welker to be imminent or required.  Ms. Metheney's claim falls within the exception contemplated under 28 U.S.C. § 2675(b) and, accordingly, her recovery is not limited to the amount initially requested in her Administrative Claim.

**IV.   Conclusion**

The Motion to Dismiss filed by Defendant USA (Docket #41) is hereby DENIED.

A status conference remains set for September 28, 2017 at 9:30 a.m.

IT IS SO ORDERED.

s/Donald C. Nugent  
DONALD C. NUGENT  
United States District Judge

DATED: September 1, 2017